IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| THOMAS W. WINSLOW, | ) | 4:09CV3147 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| v. | ) | **AND ORDER** |
| | ) | |
| RICHARD T. SMITH, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

In 1989, the plaintiff, Thomas W. Winslow, pleaded no contest to aiding and abetting second degree murder in connection with the 1985 death of Helen Wilson in Beatrice, Nebraska.  One of his five criminal co-defendants, Joseph E. White, was tried and convicted of first degree murder.  White's conviction was overturned in 2008 after DNA testing conclusively showed that blood and semen found at the crime scene belonged to Bruce Allen Smith, who had no association with White, Winslow, or the other four persons who stood convicted for the Wilson homicide.  Winslow was granted a full pardon by the Nebraska Board of Pardons on January 26, 2009.[1]

Winslow filed this civil rights action on July 15, 2009.[2]  Named as defendants are: (1) Richard T. Smith, the county attorney for Gage County, Nebraska; (2) Burdette Searcey, a Gage County deputy sheriff; (3) Gerald Lamkin, a Gage County deputy sheriff; (4) Kent Harlan, a Gage County deputy sheriff; (5) Mark Meints, a Gage County deputy sheriff; (6) Wayne R. Price, Ph.D., a Gage County reserve

---

[1] In Nebraska, the power to grant pardons is vested in the Governor, Attorney General, and Secretary of State sitting as a board.  *See* Nebr. Const., art. IV, § 13.

[2] Four to Winslow's criminal co-defendants have also filed civil rights actions. *See* Case Nos. 4:09CV3144 (James L. Dean, plaintiff), 4:09CV3145 (Joseph E. White, plaintiff), 4:09CV3146 (Kathleen A. Gonzalez, plaintiff), and 4:09CV3148 (Ada Joann Taylor, plaintiff).  A fifth criminal co-defendant, Debra Brown Shelden, has not filed an action in this court.

deputy and consulting psychologist; (7) Jerry O. DeWitt, the sheriff of Gage County; (8) the Gage County Sheriff's Office; (9) the Gage County Attorney's Office; and (10) the County of Gage, Nebraska. All individual defendants are sued both in their personal and their official capacities.

Winslow alleges that he "was unconstitutionally arrested, imprisoned and prosecuted for a rape and murder that he did not commit. Defendants solicited, fabricated, manufactured and coerced evidence of an ever-changing story, which rarely, if ever, coincided with the immutable physical evidence at the scene of the crime." (Filing 1, p. 2.) "Defendants willfully and recklessly caused witnesses and WINSLOW's alleged accomplices to provide false evidence and testimony against WINSLOW by providing each such person, each and every necessary fact that defendants deemed incriminating, and by conducting all interviews with overtly leading and suggestive questioning, clearly designed to produce a story consistent with the false narrative defendants decided was the story of the homicide that would be presented in court. WINSLOW, as well as each of his alleged accomplices, was told that they could either provide evidence consistent with defendants' adopted false narrative of the Wilson homicide, or they would face prosecution for first-degree murder and life imprisonment or execution in the electric chair." (*Id.*) "Defendants knew that some of WINSLOW's alleged accomplices were of low intelligence, diagnosed with personality disorders, and had received counseling, psychological services, or special educational services in the past. Defendants used their knowledge of such mental conditions to overbear their will and coerce false testimony against WINSLOW." (*Id.*, p. 3.) "Defendants solicited, fabricated, manufactured and coerced evidence that was demonstrably unreliable, misleading, false and failed to comport with the known immutable evidence of the Wilson homicide for the sole purpose of justifying the arrest, trial, conviction and incarceration of WINSLOW, when if defendants had not been deliberately indifferent to WINSLOW's constitutional rights, [they] would have known that WINSLOW was actually innocent of any involvement in the murder of Helen Wilson." (*Id.*, ¶ 47.)

Winslow further alleges that he "has always maintained that he was not involved in the Wilson homicide, and he did not testify for the prosecution at the trial of Joseph E. White. Nonetheless, on December 8, 1989, WINSLOW pled no contest to a charge of aiding and abetting second-degree murder. WINSLOW's plea was solely the result of defendants' coercion. WINSLOW knew that White had been convicted of first-degree murder based on fabricated and manufactured evidence, as well as false testimony and confessions. WINSLOW knew, and was told by defendants, that the same evidence used to convict White would be used to convict him of first-degree murder if he did not accept a plea deal." (*Id.*, pp. 2-3.)

It is claimed that the defendants' actions "constitute unreasonable seizure of WINSLOW in violation of the Fourth and Fourteenth Amendments to the federal Constitution[;] . . . deprived WINSLOW of his liberty without due process of law in violation of the Fifth and Fourteenth Amendments to the federal Constitution[;] . . . deprived WINSLOW of his right to a speedy public trial by an impartial jury in violation of the Sixth and Fourteenth Amendments to the federal Constitution [and ;] . . . constitute deliberate infliction of cruel and unusual punishment upon WINSLOW regarding his incarceration . . . for a crime he did not commit in violation of the Eighth and Fourteenth Amendments to the federal Constitution." (*Id.*, ¶ 49.) The complaint also contains a conspiracy count and a claim that the County, the County Sheriff's Office, and the County Attorney's Office had in effect certain policies, practices, and customs that resulted in the alleged constitutional violations.

The defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). The defendants contend that:

1.    The case is barred by the applicable statute of limitations and must be dismissed;

2.    The plaintiff cannot recover against defendants Gage County or the individual Defendants in their official capacities under 42 U.S.C. § 1983 using a theory of respondeat superior;

3

3.      Defendants Gage County Sheriff's Office and Gage County
        Attorney's Office are not suable entities under Nebraska law;

4.      Defendant [S]mith is entitled to absolute prosecutorial immunity;

5.      The complaint fails to state a cause of action against Defendant
        DeWitt;

6.      Malicious prosecution is not an action that can be brought
        pursuant to 42 U.S.C. § 1983;

7.      Plaintiff's complaint fails to state a cause of action against the
        individual defendants; and

8.      This court lacks pendant [sic] jurisdiction over any state law tort
        claims.

(Filing 31.)

## I. BACKGROUND

Winslow's complaint is 34 pages long and includes the following history of the
underlying criminal case:

> At approximately 9:30 a.m. on February 6, 1985, Helen Wilson's
> sister discovered her body in the living room of her apartment located
> at 212 N. 6th Street, Beatrice, Nebraska. The Beatrice Police (BPD)
> initiated an examination of the crime scene, and an investigation of the
> circumstances of Wilson's death. The [Gage County Sheriff's Office
> (GCSO)] became involved in the investigation of Wilson's death on this
> same day. Eventually, the Nebraska State Patrol (NSP) and the Federal
> Bureau of Investigation (FBI) would become involved in the
> investigation. SMITH and his office, the [Gage County Attorney's
> Office (GCAO)], worked closely with both the BPD and the GCSO
> during this initial investigatory phase.

> Examination of Wilson's apartment building indicated that the
> assailant gained entry to Wilson's apartment by prying the doorstop

4

from the doorframe and slipping the lock. The residents of the apartment building reported that the hall lights for the building were always on. However, on the morning of February 6, the hall lights were off and the furnace to one of the apartments was not working. Examination of the basement utility room indicated that the hall lights had been turned off at the fuse box in the basement. The [sic] two of the apartment building residents recalled coming home and seeing the hall lights on around 12:15 a.m. on February 6. The last known person to see Helen Wilson alive was her son Darrell Wilson, who left Wilson's apartment at approximately 9:45 p.m. on February 5.

Examination of Wilson's apartment indicated that a struggle occurred in her bedroom, as evidenced by considerable disarray and a large amount of dried blood. However, in the living room where Wilson's body was discovered, there was little evidence of a struggle and virtually no evidence of dried blood. There were defensive cuts to Wilson's hands, and a steak knife similar to knives found in Wilson's kitchen was found in the bedroom. Wilson was discovered lying on her back on the floor near the sofa with an afghan wrapped tightly around her face, and her hands loosely bound in front of her with a towel. Her nightgown was pulled up exposing her from the waist down. Her underpants had been removed without damage and placed on the sofa. Wilson was wearing booties and calf-length nylons that had been neatly rolled down to her ankles. Found in the apartment was a significant amount of cash – $1,180.00 in twenties, fifties and one hundred dollar bills, as well as checks and several large money market certificates.

Wilson's autopsy indicated that the cause of death was suffocation due to the afghan wrapped tightly around her head and stuffed into her mouth. She also suffered a fractured sternum, fractured left fifth and sixth rib, and a fractured left humorous near her elbow. Wilson had been sexually assaulted, both vaginally and anally, with penetration occurring most likely after Wilson's death. An FBI analysis of the crime scene evidence and investigation concluded that robbery was not the motive for the crime. The FBI report also concluded; "We can state with almost total certainty that this crime was committed by one individual acting alone."

Examination of the blood recovered from Wilson's bedroom and the semen recovered from Wilson's body indicated that the assailant had type B blood and was a non-secretor of blood group substances in his bodily fluids. DNA testing was not available at the time of Wilson's murder. . . .

Under SMITH's direct supervision, the BPD, the GCSO and the NSP interviewed every individual in the Beatrice vicinity with a known history of sexual assault behavior. The interviews eventually expanded to include virtually anyone who was known to law enforcement, or anyone who may have been the subject of one of the many rumors circulating around Beatrice regarding who may have committed the Wilson rape and murder. WINSLOW and many, if not all of those individuals who were later accused of being his accomplices were interviewed by the BPD or GCSO during the 1985 phase of the Wilson murder investigation. WINSLOW, as well as all of those later accused as his accomplices, were never considered to be serious suspects by the BPD, the GCSO or the NSP during the 1985 phase of the Wilson homicide investigation.

In 1985, SEARCEY was not a member of the GCSO. Nonetheless, SEARCEY conducted his own interviews, falsely advising the interviewees that he was a private investigator working on the Wilson homicide. WINSLOW was one of those who SEARCEY interviewed as part of his private investigation. SEARCEY made no contemporaneous records or reports of his interviews, including his interview with WINSLOW. None of SEARCEY's interviews were recorded. SEARCEY went so far as to ask his friends at the BPS for access to the crime scene reports and photographs to assist him with his private investigation. The BPD refused SEARCEY's request.

SEARCEY joined the GCSO as a deputy sheriff in January 1987, and almost immediately asked for, and received, access to the 1985 Wilson homicide investigation file. In January 1989, SEARCEY re-interviewed Lisa Podendorf, who SEARCEY claimed provided evidence of WINSLOW's culpability, as well as the culpability of Joseph White and Ada Joann Taylor, for the Wilson rape and murder during his 1985 private investigation.

On February 15, 1989, SEARCEY interview[ed] WINSLOW at the Lancaster County Corrections Center.  WINSLOW and Clifford Shelden were being held for an assault occurring in Lancaster County. SEARCEY falsely advised WINSLOW that he did not believe that WINSLOW was involved in the Wilson homicide, but that he had information that might aid in the investigation.  WINSLOW was told his cooperation with SEARCEY would be a consideration for reducing the Lancaster County assault charges.  SEARCEY's interview of WINSLOW on this occasion consisted of leading questions and suggested testimony directed at corroborating Lisa Podendorf's statement and implicating White and Taylor in the Wilson homicide. Notwithstanding SEARCEY['s] direction, WINSLOW was unable to corroborate any of the material claims in Podendorf's statement.  For example, Podendorf told SEARCEY that she and Taylor were watching the police cars around the Wilson apartment building at 7:30 a.m. on February 6 when Podendorf claimed Taylor told her that Taylor and White had murdered Wilson the night before.  However, WINSLOW claimed that White and Taylor were in his apartment at 7:30 a.m. on February 6, cleaning up and fixing themselves breakfast. In addition, Podendorf told SEARCEY that she saw WINSLOW, White, Taylor and Beth Johnson Winslow get out of WINSLOW's automobile at 10:18 p.m. on February 5, and go into Wilson's apartment building. However, WINSLOW told SEARCEY that he loaned his automobile to White and Taylor the evening of February 5, and that they returned his automobile the next morning. Contrary to Podendorf's statement, WINSLOW claimed he spent the evening of February 5 playing cards with his wife, Beth, at Charlotte Bishop's apartment.

Purporting to rely on the statements by Podendorf and WINSLOW, as well as a statement by Charlotte Bishop, on March 14, 1989, SEARCEY with assistance from SMITH prepared an affidavit for an arrest warrant for White and Taylor.  SMITH and SEARCEY falsely represented in SEARCEY's affidavit that Podendorf was a credible informant, and that her information was corroborated by Thomas Winslow, when in fact, Winslow's statements to SMITH and SEARCEY contradict Podendorf.

SEARCEY, with SMITH's assistance with under SMITH's direction, filed his affidavit, and a subsequent addendum thereto, in the Gage County Court on March 14, 1989.  The affidavit and addendum both contained several false or misleading statements, and claims inconsistent with the immutable evidence from 1985. . . .  SMITH and SEARCEY, acting together, deliberately misled the County Court by reciting in the affidavit that Taylor made the statement to Podendorf [that Taylor and White murdered Helen Wilson] "within 24 hours" of the discovery of Wilson's body, when in fact, Podendorf claimed Taylor made her statement before Wilson's body was discovered.

SMITH and SEARCEY falsely represented in SEARCEY's affidavit that Podendorf was a reliable informant because she knew from Taylor about "the binding of Mrs. Wilson's body when found . . . ."  This is a false statement.  Podendorf told SEARCEY that Taylor told her Wilson would be found with her hands tied behind her back, when in fact Wilson's hands were loosely bound in front. In addition, Podendorf said nothing in her recorded statement about the afghan wrapped tightly around Wilson's head.

After falsely averring to the County Court that WINSLOW's statement corroborated Podendorf, SMITH and SEARCEY recognized that WINSLOW's story, in fact, contradicted Podendorf's story. SMITH and SEARCY then arranged to take a second statement from WINSLOW, who was in custody in Lancaster County for an unrelated assault. WINSLOW was promised use immunity as to the Wilson homicide, a reduction of the Lancaster County assault charge, and a reduction of his bond in return for his statement.  SMITH, SEARCEY, DEWITT and HARLAN were present for WINSLOW's statement along with WINSLOW's counsel. WINSLOW initially told SEARCEY a story similar to his first story – that he loaned his car to White and Taylor on the evening of February 5. SEARCEY told WINSLOW that he did not believe him, that WINSLOW must be having memory problems, and that WINSLOW knew more than what he was telling.  SEARCEY then provided WINSLOW with the information SEARCEY was looking for by way of suggestion, leading questions, and by directly telling WINSLOW what SEARCEY expected WINSLOW to say. For example, it was only after SEARCEY told WINSLOW that someone identified

him going into the Wilson apartment building that WINSLOW agreed with SEARCEY that he went into the building.  When WINSLOW could not "remember" whether he went up the stairs or down the stairs to get to Wilson's apartment, SEARCEY suggested, "Could you have had to go up some stairs?" to which WINSLOW replied, "Yea, we could have (but) I don't remember." SEARCEY suggested to WINSLOW that WHITE raped Wilson anally, to which WINSLOW replied "I think he might have said something about rectum."  Based solely on this second interview, SMITH and SEARCEY provide[d] the County Court with an addendum to SEARCEY's affidavit claiming now that Podendorf's statement is totally corroborated by WINSLOW's new statement. However, in fact, WINSLOW's statements to SEARCEY and SMITH were the product of coercion, leading questions, suggested answers to questions, and the promise of very favorable treatment in exchange for a story that conformed to what SEARCEY and SMITH wanted to hear[.]

White was arrested by the Cullman, Alabama police late at night on March 15, and questioned by SEARCEY, BPD Detective Stevens, and PRICE beginning around 12:10 a.m. on March 16. White denied all involvement in the Wilson homicide, and denied having any knowledge about who may have committed the Wilson homicide. . . .

When SEARCEY failed to obtain a confession or any inculpatory statements from White, he went to North Carolina, along with BPD Sergeant Stevens, to interrogate Ada Joann Taylor.  Taylor was arrested just before midnight on March 15, the same day as White, at her home in Buncombe County, North Carolina, pursuant to the same materially false affidavit and addendum for arrest warrant used to arrest White. The North Carolina police interrogated Taylor upon arrest, while SEARCEY and Stevens were still in Alabama with White.  The North Carolina police told Taylor that White was under arrest and had implicated her in the rape and murder of Helen Wilson. Taylor then attempted to describe for the North Carolina police where, when and how the Wilson homicide occurred.  Taylor failed to provide a story that comported with even one known fact of the case. . . . She said that another boy that she did not know accompanied White, and he drove a baby blue small car.

9

SEARCEY and Stevens interrogated Taylor on March 16, beginning around 8:17 p.m. Taylor at first repeated the same factually implausible story she told the North Carolina police. SEARCEY and Stevens then began to purposely and systematically supply Taylor with information consistent with the actual evidence of the Wilson homicide, as well as information consistent with the false narrative of the Wilson homicide adopted by SEARCEY. . . . SEARCEY and Stevens suggested who accompanied White and Taylor to Wilson's apartment, as well as who did not accompany them when Taylor selected the wrong person for SEARCEY's false narrative. SEARCEY suggested that they stop recording the interrogation so that Taylor could take a break and think about some things, at which point there is a nineteen-minute gap in the videotape of the interrogation. Upon resumption of the videotape, SEARCEY and Stevens continued to ask only leading questions and provide Taylor with all the information SEARCEY deemed necessary for Taylor to recite a story of the Wilson homicide consistent with SEARCEY's false narrative, but with one exception. SEARCEY tried to get Taylor to name WINSLOW as the boy who accompanied White to Wilson's apartment. Although Taylor knew WINSLOW well, she could not come up with WINSLOW's name, but told SEARCEY she could recognize his photograph.

Taylor waived extradition and flew back to Beatrice with SEARCEY and Stevens on March 17. Once back in Beatrice, SEARCEY arranged to show Taylor a photo lineup so that Taylor could identify the boy she knew, but whose name she could not remember. The photo lineup contained six photographs, but four of the individuals were persons unknown to Taylor. The remaining two photographs were WINSLOW and Mark Goodson. However, SEARCEY had already told Taylor that Goodson was not involved in the Wilson homicide. Accordingly, the only person who Taylor could identify in this lineup was WINSLOW. Taylor was also interrogated again on March 17, with SEARCEY and Stevens using leading questions, suggesting all pertinent facts, and correcting Taylor when she failed to adopt a fact or circumstance that fit SEARCEY's false narrative of the Wilson homicide.

10

SMITH and SEARCEY knew that in 1984, while living in Beatrice, Taylor had received psychological counseling from PRICE. PRICE knew that Taylor had a limited education, frequently abused alcohol and illegal drugs, had a diagnosed personality disorder, and was prone to magical thinking. PRICE used his knowledge of Taylor's mental deficiencies to assist SMITH and SEARCEY in building the false narrative of Wilson's rape and homicide.

SEARCEY asked White, Taylor and WINSLOW their blood types during the course of their interrogations. White and Taylor both said they were type O, and WINSLOW said he was type A. SMITH and SEARCEY knew that a significant amount of type B blood was found in Wilson's bedroom, and that Wilson was type O. Thus, SMITH and SEARCEY knew that Wilson's assailant must have type B blood, and that the suspects they had in custody did not. SEARCEY, at SMITH's direction, began contacting and interviewing every person known to have been associated with White, Taylor or WINSLOW in 1985. SEARCEY and Stevens contacted Debra Shelden at her home in Lincoln on March 24, 1989. Debra Shelden was one of Taylor's roommates in early 1985. Debra Shelden told SEARCEY that she had no direct knowledge of the Wilson homicide, but that her husband, Clifford Shelden, received a letter from Taylor sometime after the Wilson homicide in which Taylor said that she and White were responsible for Wilson's murder.

On April 12, SEARCEY and LAMKIN interviewed Clifford Shelden. Clifford Shelden was confined at the Lancaster County Corrections Center, waiting sentencing for his role in the assault he committed with WINSLOW. Clifford Shelden had given two prior statements to Lincoln Police Detective Tim Domgard regarding his knowledge of the Wilson homicide, neither of which provided any meaningful evidence. SEARCEY and LAMKIN began the interview with Clifford Shelden at around 1:30 p.m., but did not begin recording the interview until 4:55 p.m. During the recorded portion of the interview, Clifford Shelden told SEARCEY and LAMKIN that Taylor sent him a letter in which she said that she, White and WINSLOW were responsible for the Wilson homicide. This claim is inconsistent with Clifford Shelden's prior statements to LPD Detective Domgard.

11

Additionally, and for the first time, Clifford Shelden claimed that WINSLOW told him in specific detail all about Wilson's rape and murder. WINSLOW's story, according to Clifford Shelden was that White, Taylor and WINSLOW all participated in Wilson's murder and sexual assault. SEARCEY asked if another person was involved, and Clifford Shelden said WINSLOW told him Clifford's wife, Debra, was there. . . . SEARCEY and LAMKIN knew that Clifford Shelden's claim about what WINSLOW told him was completely inconsistent with, and contrary to, the immutable physical evidence found at the homicide. . . .

On April 13, SEARCEY and LAMKIN reinterviewed Debra Shelden. . . . Debra Shelden now claimed she was present when White, WINSLOW and Taylor raped, robbed and murdered Wilson. Debra Shelden's story on this occasion was similar to the story told by her husband Clifford the day before.. . . SEARCEY and LAMKIN knew that Debra Shelden's story was false because Debra claimed that Wilson was raped and murdered between 8:00 and 9:30 p.m. However, the 1985 investigation positively established that Wilson's son Darrell was with her until approximately 9:45 p.m. on the evening of the murder. Notwithstanding, SEARCEY and LAMKIN placed Debra Shelden under arrest for the murder of Helen Wilson. Notwithstanding, SEARCEY and LAMKIN placed Debra Shelden under arrest for the murder of Helen Wilson. Shelden agreed to provide a blood sample on the morning of April 14, which demonstrated that Shelden's blood type was not type B.

In her April 13 interview, Shelden unequivocally told SEARCEY and LAMKIN that only White, WINSLOW, Taylor and herself were involved in the Wilson homicide, and that she had left nothing out of her statement regarding the occurrence of the murder. However, on the morning of April 14, after SEARCEY learned that Shelden was not blood type B, SEARCEY and LAMKIN interviewed Debra Shelden for the third time in three weeks. SEARCEY began the interview by suggesting that yet another person was involved in the Wilson homicide, and that person was James Leroy Dean. Debra Shelden agreed with SEARCEY's suggestion. With SMITH's cooperation and direction, a warrant was obtained for Dean's arrest. Dean was arrested on April 15, and was interrogated by SEARCEY and LAMKIN on April 16. This interrogation was not recorded. Dean denied all involvement in the

12

Wilson homicide and volunteered to provide a blood sample, which demonstrated that his blood type was type O.

On April 24, PRICE evaluated Debra Shelden at the request of Shelden's lawyer. PRICE had evaluated Shelden in 1978 on the referral of the Gage County Probation Office. PRICE knew that Shelden received special education services as an adolescent, she had low intelligence, acted impulsively, and lacked an awareness of the consequences or social ramification of her actions. PRICE counseled Shelden about how to better remember the events of the Wilson homicide. PRICE told Shelden that she was traumatized by the violence she witnessed to Wilson, and was repressing her memories of the event. PRICE instructed Shelden that if she could relax she would recall more of the details of the homicide, and that she might recall more of the homicide in her dreams rather than when awake. Following her meeting with PRICE, Shelden started to claim that all of her memories of the Wilson homicide came to her in dreams and nightmares, some going back to 1985.

SMITH requested, and Dean, through defense counsel, agreed to submit to a polygraph examination. Prior to the date of the polygraph examination, SEARCEY provided the examiner, Paul Jacobson, with copies of statements from Clifford Shelden and Debra Shelden. On April 29, HARLAN transported Dean to Lincoln for the polygraph examination. Dean again denied all involvement in the Wilson homicide. However, Jacobson told Dean that he did not do well on the polygraph examination. Jacobson told Dean that he needed to level with his attorney, and consider pleading to a lesser charge rather than face conviction for first-degree murder and execution in the electric chair. On May 2, SMITH and DEWITT, with consent of Dean's counsel, arranged for Dean to meet with PRICE. PRICE characterized this meeting as an emergency, however, no psychological emergency existed at this particular time. PRICE interviewed Dean, and determined that Dean lacked education, had low intelligence, was easily influenced, and had a significant psychiatric history including instances of institutional treatment. PRICE told Dean that he failed the polygraph examination, and that this revealed at a subconscious level his involvement in the Wilson homicide. PRICE, pretending to be Dean's therapist, counseled

13

Dean that he was traumatized by the violence he witnessed to Wilson and was repressing his memories.  PRICE counseled Dean that if he relaxed, lay down on his bunk in his jail cell, and tried to picture Wilson's apartment, his memory of the Wilson murder would come back to him.  Thereafter, Dean would tell SMITH, DEWITT, HARLAN, SEARCEY, MEINTS and LAMKIN that he was remembering pieces of the Wilson homicide, mostly in dreams.  Dean eventually began reciting a story similar to the false narrative of the Wilson homicide first proposed by Clifford Shelden, and later adopted by Debra Shelden and the defendants.  At all times while in the Gage County Jail, Dean had in his possession copies of the statements made by Cliff Shelden and Debra Shelden, and had access to newspaper and television accounts of the Wilson case.

SMITH, SEARCEY and the other defendants realized that they still did not have a suspect in custody whose blood was type B.  In early May, DEWITT, HARLAN, LAMKIN, MEINTS and SEARCEY contacted both Shelden and Dean while both were confined in the Gage County Jail, and suggested to both that another person was involved in the Wilson homicide.  The defendants suggested to both Shelden and Dean, on multiple occasions that Kathy Gonzalez was also involved in Wilson's homicide.  SEARCEY obtained a photograph of Gonzalez from the BPD and showed both Shelden and Dean this photograph in his effort to get both to actually name Gonzalez as a participant in the homicide. On May 24, both Shelden and Dean provide[d] statements to SEARCEY and LAMKIN reciting that Gonzalez was a participant in the Wilson homicide. Both Shelden and Dean claimed that a nightmare, dream, or simply by relaxing, consistent with the direction of PRICE, they were able to "remember" Gonzalez's participation.

On May 25, Kathy Gonzalez was arrested at her place of employment in Denver, Colorado. Upon her arrest, Gonzalez was interrogated by SEARCEY, DEWITT and LAMKIN, and denied all knowledge of, and involvement in, the murder of Helen Wilson. . . .

Gonzalez voluntarily provided defendants with a blood sample. The NSP serologist determined that Gonzalez's blood type was type B. However, an examination of the complete serological profile of

Gonzalez's blood clearly demonstrated that the type B blood found in Wilson's apartment was not consistent with Gonzalez's blood, in that they differed as to one key enzyme. Defendants deliberately and purposefully ignored this evidence . . ..

SMITH reduced the charges against Shelden, Dean, and Taylor in exchange for their agreement to testify at White's trial consistent with the false narrative of the Wilson homicide constructed by the defendants.

From June through October, defendants continued to suggest new evidence for Shelden, Dean, and Taylor to "remember" that supported the false narrative of Wilson's homicide constructed by defendants to convict White of first-degree murder.

Trial of White's matter began November 3, 1989, and concluded November 8. Debra Shelden, Dean and Taylor testified against White, reciting the false narrative of the Wilson murder constructed by the defendants. White was convicted by a jury of first-degree murder, and on February 16, 1990, White was sentenced to life in prison.

Following White's conviction, SMITH offered WINSLOW a plea agreement where WINSLOW could plead no contest to aiding and abetting second-degree murder. WINSLOW knew that the same false evidence used to convict White of first-degree murder would be used against him if he rejected SMITH's plea deal. As such, on December 8, 1989, WINSLOW accepted SMITH's plea deal. The court accepted WINSLOW's plea and sentenced him to fifty years imprisonment. WINSLOW's sentence was significantly longer than were the ten-year sentences given Shelden and Dean for their guilty pleas to second-degree murder. This disparity of sentencing was due entirely to the false testimony at White's trial regarding WINSLOW's claimed participation in the murder.

(Filing 1, ¶¶ 9-39 (paragraph numbering omitted).)

## II.  DISCUSSION

When confronted with a Rule 12(b)(6) motion, all the factual allegations contained in the complaint are accepted as true, and the complaint is reviewed to determine whether its allegations show that the pleader is entitled to relief.  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007).  If the complaint does not state "enough facts to state a claim to relief that is plausible on its face," it must be dismissed for failure to state a claim. *Id.* at 1974. The complaint must state enough facts to "nudge [the] claims across the line from conceivable to plausible. . .." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 1965 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

For the reasons discussed below, the defendants' motion to dismiss will be granted in part and denied in part:  The Fourth Amendment claim  will be dismissed as untimely.  The Fifth Amendment claim also will be dismissed as untimely to the extent that the plaintiff alleges he was coerced to incriminate himself, but otherwise the claim will be allowed to proceed.  The Gage County Sheriff's Office and Gage County Attorney's Office will be dismissed as parties.  Any state-law claims alleged in the complaint for false arrest, false imprisonment, malicious prosecution, or other torts will be dismissed without prejudice.  In all other respects, the defendants' motion will be denied.

### A.  Statute of Limitations

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a

16

federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.*, at 486-87 (footnote omitted).[3] The Eighth Circuit has held that an executive pardon which is based on a finding of innocence satisfies the *Heck* criteria. *See Wilson v. Lawrence County*, 154 F.3d 757, 760-61 (8th Cir. 1998).

To the extent that any claims made in the present action rest on the invalidity of the plaintiff's conviction or sentence, the statute of limitations did not begin to run until the plaintiff was pardoned on January 26, 2009, which was less than six months before this § 1983 action was filed. *See Heck*, 512 U.S. at 490 ("Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, . . . a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."); *Wallace v. Kato*, 549 U.S. 384, 393 (2007) ("[T]he *Heck* rule for deferred accrual . . . delays what would otherwise be the accrual date of a tort action until the setting aside of an extant conviction which success in that tort action would impugn.") (emphasis omitted).

The applicable limitations period is four years. *See Poor Bear v. Nesbitt*, 300 F.Supp.2d 904, 912-13 (D.Neb. 2004); Neb. Rev. Stat. § 25-207. The statute of limitations is not tolled during a term of imprisonment absent "a showing of a recognizable legal disability, separate from the mere fact of imprisonment, which prevents a person from protecting his or her rights[.]" *Gordon v. Connell*, 545 N.W.2d 722, 726 (Neb. 1996).[4]

_____

[3] The Supreme Court analogized the prisoner's § 1983 claim to a common-law cause of action for malicious prosecution, which, "unlike the related cause of action for false arrest or imprisonment, . . . permits damages for confinement imposed pursuant to legal process." *Heck*, 512 U.S. at 484. "One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused." *Id.*

[4] "Section 1983 claims are governed by the personal injury statute of limitations of the state where the claim arose." *Bridgeman v. Nebraska State Pen,*

The defendants attempt to compare the present action to *Wallace*, in which the Supreme Court held that an action for unlawful arrest accrued when the plaintiff was bound over for trial, not eight years later when he was released from custody after the charges against him were dropped following a successful appeal.  The defendants suggest that "Plaintiff has basically alleged false arrest and false imprisonment in his Complaint."  (Filing 32, p. 7.)  Winslow disputes this characterization of his action and states that he instead is claiming malicious prosecution.  (Filing 38, p. 3.)  However, the caption to count I of Winslow's complaint specifically lists "false arrest" as a theory of recovery.  (Filing 1, p.28.)

Winslow claims there was an unreasonable seizure of his person in violation of the Fourth and Fourteenth Amendments.  He alleges that the defendants "solicited, fabricated, manufactured and coerced evidence that was false, misleading and demonstrably unreliable for the deliberate purpose of . . . [p]roviding probable cause for the arrest and confinement of WINSLOW [and] . . . [o]btaining orders preventing WINSLOW from securing release on bond[.]"  (Filing 1, ¶ 48.)  Even assuming that a Fourth Amendment violation has been sufficiently pleaded in the complaint, such a claim does not require any showing that Winslow's subsequent conviction was invalid.  In other words, the claim could have been brought at any time.  *See Moore v. Sims*, 200 F.3d 1170, 1171-72 (8th Cir. 2000) (per curiam) (inmate's claim that he was unlawfully seized was not barred by *Heck* rule since proof that inmate's initial seizure and detention by officers was without probable cause would not necessarily imply the invalidity of his drug-possession conviction). The Fourth Amendment claim is barred by the statute of limitations.[5]

---

849 F.2d 1076, 1077 (8th Cir. 1988) (per curiam).  "The use of a state's statute of limitations also requires the use of its tolling statutes and the operation thereof is governed by state law."  *Id.*, at 1078.

[5]"[W]hen it 'appears from the face of the complaint itself that the limitation period has run,' a limitations defense may properly be asserted through a Rule 12(b)(6) motion to dismiss."  *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th

Winslow next claims that he was deprived of his liberty without due process of law in violation of the Fifth and Fourteenth Amendments.  He alleges that the defendants "solicited, fabricated, manufactured and coerced evidence that was false, misleading and demonstrably unreliable for the deliberate purpose of . . . [c]orrupting the judicial system so that WINSLOW could not possibly receive a fair trial, and thereby, coerce him to plead no contest to a crime he did not commit."  (Filing 1, ¶ 48.)  Although Winslow alleges that he has always maintained his innocence, he also alleges that he made "statements to SEARCEY and SMITH [that] were the product of coercion, leading questions, suggested answers to questions, and the promise of very favorable treatment in exchange for a story that conformed to what SEARCEY and SMITH wanted to hear[.]"  (*Id.*, ¶ 21.)  If Winlsow is claiming that he was coerced into providing a self-incriminating statement, the *Heck* rule again has no application.  *See Simmons v. O'Brien*, 77 F.3d 1093, 1095 (8th Cir. 1996) (§ 1983 claim challenging voluntariness of confession, if successful, would not necessarily imply that the plaintiff's conviction was unlawful).  Winslow's claim that his plea was involuntary is a different matter.

Under *Heck*, a claim that a Winslow's plea was involuntary could not have been maintained prior to Winslow receiving his pardon.  *See, e.g., Bills v. Adair*, No. 08-12207, 2009 WL 440642, at *10 (E.D.Mich. Feb. 23, 2009) (inmate could not bring § 1983 action claiming that defendants forced him to plead no contest to charges for which he was convicted); *Smith v. Hayden*, No. 5:05-cv-00884, 2009 WL 1299033, at *6-7 (S.D.W.Va. Feb. 3, 2009) (inmate's *Bivens* claim that he was "railroaded" into involuntary plea not cognizable pursuant to *Heck*), *report and recommendation adopted*, 2009 WL 1287033 (S.D.W.Va. May 8, 2009).  *Cf. Jean-Laurent v. Hennessy*, No. 05-CV-1155,  2008 WL 3049875, at *8 (E.D.N.Y. Aug. 1, 2008) ("[T]o determine whether plaintiff's guilty plea was entered involuntarily as a result of ineffective assistance of trial counsel would squarely violate the rule in *Heck*, as such an inquiry would necessarily require this Court to

_____

Cir. 2004) (quoting Wycoff v. Menke, 773 F.2d 983, 984-85 (8th Cir. 1985)).

19

call plaintiff's conviction into question."). Similarly, Winslow's claim that the defendants manufactured evidence and otherwise tainted the criminal proceedings would necessarily call into question the validity of his conviction. *See Heck*, 512 U.S. at 479 (prosecutors and police allegedly engaged in "unlawful, unreasonable, and arbitrary investigation" leading to petitioner's arrest" and "knowingly destroyed" evidence "which was exculpatory in nature and could have proved [petitioner's] innocence"); *Moore v. Sims*, 200 F.3d at 1172 (inmate's § 1983 claim that evidence was unlawfully "planted" was *Heck*-barred and therefore properly dismissed); *Moore v. Novak*, 146 F.3d 531, 535-36 (8th Cir.1998) (plaintiff convicted of assaulting officer was *Heck*-barred from bringing § 1983 claim that officer destroyed or secreted videotape of incident).

Third, Winslow claims that he was deprived of his right to "a speedy public trial by an impartial jury" in violation of the Sixth and Fourteenth Amendments. Because Winslow waived these rights by pleading guilty, *see Cox v. Lockhart*, 970 F.2d 448, 453 (8th Cir.1992) (defendant's guilty plea, knowingly and voluntarily entered, waived right to speedy trial), this claim apparently mirrors the Fifth Amendment claim that Winslow's plea was involuntary. As discussed above, such claim is not barred by the statute of limitations. Since the defendants have not raised the issue in their motion to dismiss, I make no determination as to whether a Sixth Amendment claim is sufficiently alleged in the complaint.

Fourth, and finally, Winslow claims that the defendants violated the Eighth and Fourteenth Amendments. Assuming, once again, that the allegations of the complaint are sufficient to state a claim, it is not apparent that the claim is time-barred.

## B. *Respondeat Superior*

The defendants next state in their motion to dismiss that "[t]he plaintiff cannot recover against defendants Gage County or the individual Defendants in their official

20

capacities[6] under 42 U.S.C. § 1983 using a theory of respondeat superior[.]" (Filing 31, ¶ 2.) Winslow readily acknowledges this well-established rule of law, but contends he has "plead[ed] sufficient facts to show, at least, a widespread custom or practice by the County Attorney and County Sheriff of Gage County, directed at securing WINSLOW's conviction for a crime he did not commit, by coercing falsely accused accomplices to lie under oath." (Filing 38, p. 6.) *See Springdale Educ. Ass'n v. Springdale School Dist.,* 133 F.3d 649, 651 (8th Cir. 1998) (local government cannot be held liable under § 1983 for injury inflicted solely by its employees or agents on theory of respondeat superior; rather, plaintiff seeking to impose such liability is required to identify either official municipal policy or widespread custom or practice that caused plaintiff's injury).[7]  In particular, Winslow alleges that Gage County had:

_____

[6] The official-capacity claims against the county attorney, sheriff, and deputies are redundant of the claims against the county. *See Roberts v. Dillon,* 15 F.3d 113, 115 (8th Cir.1994).

[7] There is "an important distinction between claims based on official policies and claims based on customs. Because an official policy speaks for itself about the intent of public officials, proof of a single act by a policymaker may be sufficient to support liability." *Jenkins v. County of Hennepin,* 557 F.3d 628, 633 (8th Cir. 2009) (citing *McGautha v. Jackson County,* 36 F.3d 53, 56 (8th Cir.1994)).  "To establish the existence of a policy, [a plaintiff] must point to 'a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" *Id.* (quoting *Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir.1999)).  A plaintiff "must also show that the policy was unconstitutional and that it was 'the moving force' behind the harm that he suffered." *Id.* "In contrast to the evidence required to establish an official policy, [the Eighth Circuit has] emphasized that a custom can be shown only by adducing evidence of a 'continuing, widespread, persistent pattern of unconstitutional misconduct.'" *Id.,* at 634 (quoting *Mettler,* 165 F.3d at 1204)).  "A plaintiff must also show either that policymakers were deliberately indifferent to the misconduct or that they tacitly authorized it.  From this standard it follows that '[l]iability for an unconstitutional custom . . . cannot arise from a single act.'" *Id.* (citation omitted; quoting *McGautha,* 36 F.3d at 57)).

21

A) A policy, practice and custom of failing to properly train and supervise officers in the techniques of investigating serious crimes.

B) A policy, practice and custom of using interrogation techniques that had an extreme likelihood of obtaining false and unreliable information from suspects and witnesses.

C) A policy, practice and custom of failing to discipline officers who violate the Constitution or law or otherwise act to violate the rights of criminal suspects during the course of a criminal investigation.

D) A policy, practice and custom of investigating crimes in a manner designed to prove a case against a convenient suspect by procuring unreliable evidence and, when necessary, falsifying and fabricating evidence without regard to whether policies, practices and customs might result in the conviction of persons who are actually innocent.

E) A policy, practice and custom of being deliberately indifferent to the violation of the rights of a suspect by an officer or employee.

(Filing 1, ¶ 55.)

The Supreme Court invalidated heightened pleading requirements in § 1983 suits against municipalities in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). A plaintiff is not required to plead the specific existence of an unconstitutional policy or custom. "When a complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right. Moreover, such a holding would disregard the liberality of Fed.R.Civ.P. 8(a)(2) which requires merely 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and 8(f), which states 'pleadings shall be so construed as to do substantial justice.' . . . At a minimum, a complaint must allege facts which would support the existence of an unconstitutional policy or custom." *Doe ex rel. Doe v. School Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th

Cir. 2003). Judging the complaint by this standard, Winslow has sufficiently alleged the existence of an unconstitutional policy or custom of Gage County.

### C. Sheriff's Office and County Attorney's Office

Whether a party, other than an individual or a corporation, has the capacity to be sued is determined "by the law of the state where the court is located[.]" Fed.R.Civ.P. 17(b). Each county in Nebraska may sue and be sued in its own name, Neb.Rev.Stat. § 23-101, but the same is not true of county offices or departments. *See Griggs v. Douglas County Corrections Center*, Case No. 8:07CV404, 2008 WL 1944557, at *1 (D.Neb. Apr. 29, 2008) (county corrections department); *Holmstedt v. York County Jail Supervisor (Name Unknown), 739 N.W.2d 449, 461 (Neb.App. 2007)* (county sheriff's department), *rev'd on other grounds*, 745 N.W.2d 317 (Neb. 2008); *Jameson v. Plischke*, 165 N.W.2d 373, 376 (Neb.1969) (county board of supervisors). *See also Meyer v. Lincoln Police Dept.*, 347 F.Supp.2d 706 (D.Neb. 2004) (municipal police department). Thus, the Gage County Sheriff's Office and Gage County Attorney's Office will be dismissed as parties.

### D. County Attorney Smith

Prosecutors are absolutely immune from liability in suits under § 1983 for activities that are "intimately associated with the judicial phase of the criminal process[.]" *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976). However, "that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 129 S.Ct. 855, 861 (2009). A "functional approach" is used to decide whether absolute immunity attaches to a particular kind of prosecutorial activity. *Id.* (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)). For example, in the years since *Imbler*, the Supreme Court has held "that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, or appears in court to present evidence in support of a search warrant application." *Id.* (citations omitted). On the

23

other hand, the Court has held "that absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, when the prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness in support of a warrant application." *Id.* (citations omitted).

"Before the establishment of probable cause to arrest, a prosecutor generally will not be entitled to absolute immunity." *McGhee v. Pottawattamie County*, 547 F.3d 922, 929 (8th Cir. 2008) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993)), *cert. granted*, 129 S.Ct. 2002 (Apr. 20, 2009) (No. 08-1065). The Eighth Circuit has also found that "immunity does not extend to the actions of a County Attorney who violates a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not 'a distinctly prosecutorial function.'" *Id.*, at 933.

While Winslow generally alleges that Smith "actively participated in and directed the investigation of the homicide of Helen Wilson" (filing 1, ¶ 4), he qualifies this statement by specifically alleging that Smith "worked closely with both the BPD and the GCSO during [the] initial investigatory phase" (*id.*, ¶ 9) and directly supervised interviews "during the 1985 phase of the investigation of Wilson's murder." (*Id.*, ¶ 14.) However, "WINSLOW, as well as all of those later accused as his accomplices, were never considered to be serious suspects by the BPD, the GCSO or the NSP during the 1985 phase of the Wilson homicide investigation." (*Id.*)

Winslow also specifically alleges that Smith assisted in the preparation of false affidavits for the arrest of White and Taylor (*id.*, ¶¶ 19-21); arranged for and attended the interview where Winslow changed his statement to corroborate Podendorf (*id.*, ¶ 21); developed a false narrative of the crime along with Searcey (*id.*, ¶ 26); directed Searcey to re-interview all known associates of White, Taylor, and Winslow, including Debra Shelden (*id.*, ¶ 27); directed that an arrest warrant be obtained for Dean after he was implicated by Shelden (*id.*, ¶ 30); requested Dean to submit to a polygraph examination and arranged for Dean to meet with Price (*id.*, ¶ 32); reduced

charges against Shelden, Dean, and Taylor in exchange for their testimony at White's trial (*id.*, ¶ 36); and entered into a plea agreement with Winslow (*id.*, p. 25, ¶ 39).

A prosecutor has absolute immunity for conduct in the preparation and filing a motion for an arrest warrant unless he acts as a witness. *See* Kalina v. Fletcher, 522 U.S. 118 (1997). Only Searcey is alleged to have provided sworn statements in support of White's and Taylor's arrest warrants. Also, Winslow does not have standing to recover damages for Smith's alleged violations of the constitutional rights of others. *See van Leeuwen v. United States, 868 F.2d 300, 301 (8th Cir.1989) (per curiam)* (affirming dismissal of due process claim based on violation of another person's Fifth Amendment rights); *United States v. Bruton, 416 F.2d 310, 312 (8th Cir. 1969)* (defendant lacked standing to challenge testimony of coparticipant implicating defendant in robbery on ground that such testimony was tainted by coparticipant's illegally obtained confession; Fourth and Fifth Amendment rights are personal rights and may not be vicariously asserted).

If Smith took an active part in Winslow's interview when he changed his statement to corroborate Podendorf, Smith's actions may not be subject to absolute prosecutorial immunity. Whether interviews of Winslow's criminal co-defendants preceded the filing of formal charges against him cannot be determined from the complaint, so it cannot be concluded that Smith is absolutely immune from liability regarding those interviews. On the other hand, Smith clearly has immunity for his decisions to file criminal charges against Winslow and to negotiate a plea bargain. *See Williams v. Hartje, 827 F.2d 1203, 1209 (8th Cir. 1987)* (decision of prosecutor to file criminal charges is within the set of core functions which is protected by absolute immunity; this is so even if the prosecutor makes that decision in consciously malicious manner, or vindictively, or without adequate investigation, or in excess of his jurisdiction); *Myers v. Morris, 810 F.2d 1437, 1446 (8th Cir. 1987)* (prosecutor's activities in plea bargaining context warrant absolute immunity), *overruled on other grounds by Burns v. Reed, 500 U.S. 478 (1991).*

### E.  Sheriff DeWitt

Winslow alleges that DeWitt "was the elected Sheriff for Gage County and the direct supervisor of SEARCEY, LAMKIN, MEINTS and HARLAN." (Filing 1, ¶ 2.) "To hold a supervisor liable under § 1983, a plaintiff must allege and show that the supervisor personally participated in or had direct responsibility for the alleged violations." *McDowell v. Jones*, 990 F.2d 433, 435 (8th Cir. 1993) (citing *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir.1985)).  "Or a plaintiff could show that the supervisor actually knew of, and was deliberately indifferent to or tacitly authorized, the unconstitutional acts."  *Id.* (citing *Pool v. Missouri Dept. of Corr. & Human Resources*, 883 F.2d 640, 645 (8th Cir.1989)).

Additional allegations made specifically against Sheriff DeWitt are that: "SMITH, SEARCEY, DEWITT and HARLAN were present for WINSLOW's statement along with WINSLOW's counsel. (Filing 1, ¶ 21.) "On May 2, SMITH and DEWITT, with consent of Dean's counsel, arranged for Dean to meet with PRICE." (*Id.*, ¶ 32.)  "Thereafter, Dean would tell SMITH, DEWITT, HARLAN, SEARCEY, MEINTS and LAMKIN that he was remembering pieces of the Wilson homicide, mostly in dreams." (*Id.*, ¶ 32.)  "In early May, DEWITT, HARLAN, LAMKIN, MEINTS and SEARCEY contacted both Shelden and Dean while both were confined in the Gage County Jail, and suggested to both that another person was involved in the Wilson homicide.  The defendants suggested to both Shelden and Dean, on multiple occasions that GONZALEZ was also involved in Wilson's homicide." (*Id.*, ¶ 33.) "GONZALEZ was interrogated by SEARCEY, DEWITT and LAMKIN upon arrest, and denied all knowledge of, and involvement in, the murder of Helen Wilson." (*Id.*, ¶ 34.)

Because it is alleged that DeWitt was present during Winslow's questioning, and also had some involvement in convincing Dean to adopt the false narrative of the Wilson homicide that Searcey allegedly promoted, he will not be dismissed from the case.  "If officers use false evidence, including false testimony, to secure a conviction,

the defendant's due process is violated." *Wilson v. Lawrence County*, 260 F.3d 946, 954 (8th Cir. 2001).  DeWitt and his deputies are also alleged to have caused Shelden and Dean to falsely implicate Gonzalez in the murder, but there is no indication that this was a factor in Winslow's conviction.

### F.  Malicious Prosecution

Winslow's complaint contains several references to malicious, unlawful, or wrongful prosecution.  (Filing 1, ¶¶ 43, 44, 51, 52; p. 28.)  "[M]alicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury." *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001).  "[M]alicious prosecution can form the basis of a § 1983 suit only if defendant's conduct also infringes some provision of the Constitution or federal law." *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 977 (8th Cir. 1993).  However, "[r]ead liberally, [Winslow's] malicious prosecution claim may be taken to argue a procedural due process violation." *Gunderson v. Schlueter*, 904 F.2d 407, 409 (8th Cir. 1990).  That being the case, this portion of the motion to dismiss will be denied.

### G.  Other Individual Defendants

The defendant deputy sheriffs contend that the facts alleged in the complaint are insufficient to show their participation in the alleged constitutional violations. After carefully reviewing the allegations made against each defendant,[8] I disagree.

---

[8] While there is no longer a heightened pleading requirement in §1983 suits against individual defendants, *see Doe v. Cassel*, 403 F.3d 986, 989 (8th Cir. 2005), "the complaint must include sufficient factual allegations to provide the grounds on which the claim rests." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

### 1.  *Deputy Price*

While Winslow cannot maintain an action against Price for violating Shelden's and Dean's constitutional rights, he does have standing to complain that Price intentionally caused Shelden and Dean to provide false evidence against him.

### 2.  *Deputy Searcey*

As previously discussed, to the extent Winslow is claiming that he made self-incriminating statements that "were the product of coercion, leading questions, suggested answers to questions, and the promise of very favorable treatment in exchange for a story that conformed to what SEARCEY and SMITH wanted to hear" (*id.*, ¶ 21), this claim is barred by the statute of limitations.  Searcey is also alleged to have created a "false narrative of the Wilson homicide" that was adopted by Taylor, Shelden, Dean, and to have pressured Taylor to identify Winslow as a participant.  Because an actionable due process claim is alleged against him, Searcey will not be dismissed from the action.

### 3.  *Deputy Lamkin*

Specific allegations against Lamkin include: "On April 12, SEARCEY and LAMKIN interviewed Clifford Shelden." (*Id.*, ¶ 28.)  "On April 13, SEARCEY and LAMKIN reinterviewed Debra Shelden." (*Id.*, ¶ 29.)  "Notwithstanding [that Debra Shelden gave an incorrect time for the murder], SEARCEY and LAMKIN placed Debra Shelden under arrest for the murder of Helen Wilson." (*Id.*, ¶ 29.)  "In her April 13 interview, Shelden unequivocally told SEARCEY and LAMKIN that only White, Winslow, Taylor and herself were involved in the Wilson homicide, and that she had left nothing out of her statement regarding the occurrence of the murder.  However, on the morning of April 14, after SEARCEY learned that Shelden was not blood type B, SEARCEY and LAMKIN interviewed Debra Shelden for the third time in three weeks." (*Id.*, p. ¶ 30.)  "Dean was arrested on April 15, and was

28

interrogated by SEARCEY and LAMKIN on April 16." (*Id.*)  "Thereafter, Dean would tell SMITH, DEWITT, HARLAN, SEARCEY, MEINTS and LAMKIN that he was remembering pieces of the Wilson homicide, mostly in dreams."  (*Id.,*¶ 32.)

Lamkin will not be dismissed because he is alleged to have participated in interviewing Clifford Shelden and Debra Shelden, both of whom implicated Winslow in the murder, and to have played a role in convincing Debra Shelden to falsely implicate Dean, and then convincing Dean to adopt the false narrative of the murder. Lamkin is also alleged to have worked with Searcey to obtain statements from Shelden and Dean falsely implicating Gonzalez in the murder, but, as discussed above with reference to DeWitt, there is no indication that these false statements contributed to Winslow's conviction.

### 4. Deputy Harlan

Harlan allegedly was present with Smith and Searcey during Winslow's interview.  (*Id.*, ¶ 21.)  He is also alleged to have been involved in convincing Dean to adopt the false narrative.  (*Id.*, ¶ 32.)  These allegations provide sufficient reason for Harlan to be named as a defendant.  As with DeWitt and Lamkin, however, Harlan's alleged involvement in convincing Shelden and Dean to falsely implicate Gonzalez  (*id.*, ¶ 33) appears unrelated to Winslow's conviction.

### 5. Deputy Meints

Meints is also alleged to have been involved in convincing Dean to adopt the false narrative (*id.*, ¶ 32), and will remain a defendant for that reason, but his alleged involvement in convincing Shelden and Dean to falsely implicate Gonzalez (*id.*, ¶ 33) appears unrelated to Winslow's conviction.

### *H. State-Law Tort Claims*

Finally, the defendants argue that any state-law tort claim alleged in the complaint is subject to dismissal as a matter of law.  In response, Winslow states that he "has not asked this court to take pendant [sic] jurisdiction of any claim made pursuant to the Nebraska Political Subdivision Tort Claims Act." (Filing 38, p. 10.) It is true that the complaint does not specifically invoke the court's supplemental jurisdiction under 28 U.S.C. § 1367(a), but it does reference various tort theories. To the extent that the complaint alleges any state-law claims for false arrest, false imprisonment, malicious prosecution, or other torts, those claims will be dismissed without prejudice.

## III.  CONCLUSION

The plaintiff's claim that he was unlawfully seized is barred by the statute of limitations.  Any claim that the plaintiff incriminated himself as a result of unlawful coercion is also barred by the statute of limitations.  However, the plaintiff's claims that his plea was involuntary, and that he was denied due process because of false evidence, did not accrue until the plaintiff was pardoned, and are not time-barred.

The plaintiff has sufficiently alleged that Gage County had in effect certain unconstitutional policies or customs.  The Gage County Attorney's Office and the Gage County Sheriff's Office are not suable entities.

The facts alleged regarding County Attorney Smith are sufficient to overcome a motion to dismiss with regard to absolute prosecutorial immunity because they can be fairly read to suggest that Smith acted as something other than a prosecutor during some stages of the criminal investigation.  Therefore, the motion to dismiss will be denied as to Smith on the question of absolute prosecutorial immunity, but without prejudice to reevaluation upon a properly supported motion for summary judgment.

The allegations made against Sheriff DeWitt and his deputies are also sufficient to survive a motion to dismiss.

Finally, to extent that any state-law tort claims are alleged in the complaint, they will be dismissed without prejudice.

Accordingly,

IT IS ORDERED that the defendants' motion to dismiss (filing 31) is granted in part and denied in part, as follows:

1.    The plaintiff's claim that the defendants violated his rights under the Fourth and Fourteenth Amendments by unlawfully seizing his person is dismissed with prejudice, as barred by the statute of limitations.

2.    The plaintiff's claim that the defendants violated his rights under the Fifth and Fourteenth Amendments is dismissed with prejudice, as barred by the statute of limitations, but only to the limited extent that the plaintiff alleges he was coerced to incriminate himself.  This dismissal does not affect the plaintiff's allegations that his plea was involuntary or that the defendants manufactured evidence against him.

3.    The Gage County Sheriff's Office and the Gage County Attorney's Office are dismissed from the action as non-suable entities.

4.    To the extent that the complaint alleges any state-law claims for false arrest, false imprisonment, malicious prosecution, or other torts, those claims are dismissed without prejudice.

5.    In all other respects, the defendants' motion to dismiss is denied.

November 25, 2009.          BY THE COURT:

*Richard G. Kopf*

United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.